## HEATH *v.* GRISWOLD.

*(Circuit Court, D. Vermont. January 18, 1881.)*

1. JURISDICTION OF FEDERAL COURTS—REPORTS OF REFEREES.

    The federal courts have power to try questions submitted by and render judgments upon the reports of referees.

2. PROMISSORY NOTE—PLACE OF CONTRACT—USURY.

    A promissory note made and payable in New York, but delivered and discounted in Massachusetts, is subject to the law of the latter state in relation to usury.

3. COSTS—STATUTE OF MASSACHUSETTS—FOREIGN FORUM.

    The provision of the statute of Massachusetts, allowing the defendant costs in an action upon a usurious contract, relates to the forum, and cannot be applied to a Massachusetts contract in another forum.

4. TRANSFER OF STOCK—CONVERSION.

    The transfer of stock, held as collateral security, in order to avoid liability as a stockholder, does not constitute a conversion where the original holder took the certificates under his right, with a power of attorney, to transfer such stock at will.

5. SAME—DISCHARGE OF SURETY.

    Such transfer would not discharge a surety, in whole or in part, where it was not shown that there was in reality any liability whatever resting upon such stockholder.—[ED.

*Assumpsit.*

WHEELER, D. J. This cause was referred by consent of parties given by counsel in open court, and has now been heard upon questions submitted by the report of the referee. Some doubts have arisen as to whether the courts of the United States have power to try questions submitted by, and

render judgments upon, such reports, as the statutes do not give the power in express terms. But it seems to be well settled that such power exists as incident to all courts in which trials of fact may be had. *Newcomb* v. *Wood*, 97 U. S. 581; *Lumber Co.* v. *Brechtel*, 101 U. S. 633. The action is *assumpsit* upon two promissory notes, indorsed with others by the defendant for the accommodation of William H. Dickinson, both of New York, to William Dickinson, of Massachusetts, for whose benefit this suit is brought, in successive renewal of other notes upon which the defendant was accommodation indorser or surety for William H. Dickinson, all of which were dated and signed and indorsed at New York, and some of them made payable there and sent to William Dickinson in Massachusetts, and discounted there by him, some at 12 per cent. interest, and the avails forwarded to the defendant and used for William H. Dickinson at New York. The notes were secured by corporation stock transferred by William H. Dickinson to William Dickinson, and by him to relatives, to avoid liability as a stockholder, knowing that the defendant was a mere accommodation indorser or surety. Two principal questions arise upon these facts. One is whether the law of New York which forfeited notes for usury, or that of Massachusetts which at that time forfeited three times the amount of unlawful interest, should govern; and the other is as to what the effect of that disposition of the stock was upon the liability of the defendant.

Upon the first question it is apparent that the notes did not become operative until they were delivered to and accepted by William Dickinson, which was in Massachusetts. The contracts evidenced by them were made in that jurisdiction. The interest reserved upon the discount of the notes was taken there. As to what the rate of interest shall be where a note is made at a place where the law provides one rate, and it is payable at another place where the law provides a different rate, and all other questions arising out of which law the parties are presumed to have intended to contract with respect to, there seems to be no fair question but what the law of the place of payment is to govern. The

authorities cited for the defendant abundantly show this. But this is not the question here. There is no question about what these parties intended. They all intended that on so much of the paper William Dickinson should receive 12 per cent. interest, and contracted so that the defendant might become liable to pay it. This, in New York, would be contrary to the law there, and would involve certain penal consequences, and in Massachusetts would involve other and different consequences. The law of neither state had any force in the other, or outside of its own territory. A wrong was done, in the eye of the law, by William Dickinson in reserving this interest. The question is, in which jurisdiction did he commit the offence, and by which law must it be redressed? He is not shown to have done anything in New York. All he did was done in Massachusetts. He closed the contract there; all he has received has been paid there. If the notes had been written with interest merely, and the question had been whether this meant the Massachusetts rate of 6 per cent., or the New York rate of 7, there would have been no fair question but that, when the place of payment was in New York, the New York rate of 7 was intended, and would have been lawful. But here there is no question about what was meant; it is about what was done, and what has been done has been done in Massachusetts. This distinction is clearly recognized in the authorities.

In *Andrews* v. *Pond*, 13 Pet. 65, Mr. Chief Justice Taney said, with reference to this question: "The question is not which law is to govern in executing the contract, but which is to decide the fate of a security taken upon an usurious agreement which neither will execute? Unquestionably, it must be the law of the state where the agreement was made, and the instrument taken to secure its performance. A contract of this kind cannot stand on the same principles with a *bona fide* agreement made in one place to be executed in another. In the last-named cases the agreements were permitted by the *lex loci contractus*, and will even be enforced there if the party is found within its jurisdiction. But the same rule cannot be applied to contracts forbidden by its

laws and designed to evade them. In such cases, the legal consequences of such an agreement must be decided by the law of the place where the contract was made."

In *Tilden* v. *Blair*, 21 Wall. 241, the acceptance in controversy was executed in New York, and made payable there, but was negotiated in Chicago, at a rate exceeding that allowed by law at either place, but the consequences were different. It was held that the contract was made in Illinois, and was to be governed by the law there. These cases are sufficient to govern the ruling of this court in this case. As this was a Massachusetts contract, no reason is seen why so much of the law of that state as relates to the security itself should not be applied to it. That law was that "when, in an action brought on such contract or assurance, it appears that a greater rate of interest than is allowed by law has been directly or indirectly reserved, taken, or received, the defendant shall recover his full costs, and the plaintiff shall forfeit threefold the amount of the interest unlawfully reserved or taken, and no more, and shall have judgment for the balance remaining due after deducting said threefold amount." Under this statute, when unlawful interest is reserved on a note and the amount is carried by renewal into other notes, the threefold amount is to be deducted in an action upon the last note. *Upham* v. *Brimhall*, 11 Met. 526. So, in this action, threefold the amount of such unlawful interest as was brought forward into these notes is to be deducted as of the dates when these sums were brought in. The amount is shown by the report to be the amount reserved on Nos. 1, 5, 8, and 9, on page 4, and might be readily computed, except that the length of time for which No. 9 was discounted does not appear. As the two notes in each suit are of the same date, and alike, one-half the amount to be deducted should be applied to each. The recovery of costs by the defendant, under that statute, relates to the forum, and cannot apply here in a different forum.

It is argued that as the corporation's stock transferred to William Dickinson was a pledge for the security of the notes, a conversion of it to his own use would operate as a payment

to the extent of its value at the time of conversion, and that the transfer of it was such a conversion; or, if not a conversion, such a misappropriation as would discharge the surety, at least, to the same extent. If the effect of a conversion would be as claimed, there must be a real conversion first. What appears to have been done does not amount to that. He did not put it to his own use in any respect. He put it into other hands to hold for him, in order that what was intended for a security might not be a burden. The honesty of the purpose is not important in this respect. The question is as to the amount of what was done, not the motive with which it was done. If it amounted to a conversion, good motives would not make it less; and, if not, bad ones would not make it more. He did not exercise any dominion over it in defiance of the rights of those for and from whom he held it, but only in furtherance of the object for which he took it. He did not sell it, but merely transferred it to be held for him, and took the certificates under his right, with a power of attorney to transfer it at his will again, which he held coupled with his interest.

The further question is whether what he did so impaired the security as to affect the right of the surety. Under the circumstances he was bound to so manage it that the surety should not, in any substantial degree, be deprived of its application to the debt. He was not at all responsible for the depreciation in its value. He is only to be affected by what would affect its title injuriously. Placing it in other hands would not have that effect, unless it was so placed as to be beyond his and the surety's reach and control. The power of attorney would keep it within his control, unless it was revocable against his will. Had it been their property it would be, but coupled with his interest it would not be. *Hunt v. Rousmanier*, 8 Wheat. 174; Story on Agency, § 477.

Still it is argued that the title had been put out of his hands for an illegal purpose, and that no court would enable him to regain it, and that so the right to it was affected injuriously to the surety. It is said that the conveyance was made to avoid a liability or duty. This is not quite correct, so far as

v.5,no.7—37

the report goes. The report does not show that there was in reality any liability whatever resting upon the stockholders of that corporation. It says that he was unacquainted with the company and knew nothing of the legality of its organization, and was unwilling to incur liability as a stockholder. His fear may have been wholly vain. Without some liability to be avoided there could be no real fraud in undertaking to avoid it. And, if there had been, it would not have affected those to whom he had made transfer, and probably not their obligation to convey at his request. Those entitled to the duty might have held him to it, but that would not change the condition of this surety. He does not appear to have lost control of the property to the detriment of the surety in any way.

Judgment on the report for the plaintiff for the amount of the notes, after deducting the threefold interest applicable, which, on amendment of the report, is found to be $28,895.40.